Erik J. Halverson (SBN 333492)
**K&L GATES LLP**
4 Embarcadero Center, Suite 1200
San Francisco, CA 94111
Telephone: (415) 882-8238
Fax: (415) 882-8220
erik.halverson@klgates.com

Jason A. Engel (*pro hac vice*)
Rebekah Hill (*pro hac vice*)
**K&L GATES LLP**
70 W. Madison St., Suite 3300
Chicago, IL 60602
Telephone: (312) 372-1121
Fax: (312) 827-8000
jason.engel@klgates.com
rebekah.hill@klgates.com

*Attorneys for Plaintiff LS Cable & System Ltd.*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| LS CABLE & SYSTEM LTD., <br><br> Plaintiff, <br><br> v. <br><br> APPLE INC., <br><br> Defendant. | Case No. 3:24-cv-09194-JD <br><br> **PLAINTIFF LS CABLE & SYSTEM LTD.'S AMENDED OPENING CLAIM CONSTRUCTION BRIEF** |

**TABLE OF CONTENTS**

I.   INTRODUCTION ........................................................................................................ 1

     A.   The '568 Patent ............................................................................................. 1

     B.   The Parties' Claim Construction Positions ................................................... 2

II.  LEGAL FRAMEWORK ............................................................................................ 4

III. LEVEL OF ORDINARY SKILL IN THE ART ...................................................... 6

IV.  ARGUMENT ............................................................................................................. 6

     A.   Apple's Belated Attempt to Inject New, but Previously Available, Claim
          Construction Disputes Is Improper ............................................................... 6

     B.   Disputed Claim Terms ................................................................................... 8

     i.   "at both ends" (Claims 1, 7, 48, 54, 55, 56, and 58) ................................... 8

     ii.  "a microprocessor" (Claims 1 and 48) ....................................................... 11

     iii. "a microprocessor" (Claim 58) ................................................................... 12

     iv.  "a microprocessor" (Claim 7) ..................................................................... 13

     v.   "an overvoltage monitoring unit" (Claims 1, 48, 54, 55, and 58) ............. 13

     vi.  "an overvoltage monitoring unit for monitoring voltages at both ends of the
          constant voltage/constant current supplier and transmitting a monitoring
          result to the external contact-less charging device by means of wireless
          communication" (Pre-reexamination Claims 1, 7, and 21) ......................... 15

     vii. "an overvoltage monitoring unit detecting first and second voltages at both
          ends of the constant voltage/constant current supplier, monitoring the
          detected voltages at both ends of the constant voltage/constant current
          supplier and transmitting a monitoring result to the external contact-less
          charging device by means of wireless communication" (Claim 56) ........... 17

     viii. "monitoring result" (Claims 1, 7, 48, 54, 55, 56, and 58) ......................... 17

V.   CONCLUSION ......................................................................................................... 18

# TABLE OF AUTHORITIES

*3M Innovative Props. Co. v. Tredegar Corp.*,
    725 F.3d 1315 (Fed. Cir. 2013) ............................................................................................. 5

*Acumed LLC v. Stryker Corp.*,
    483 F.3d 800 (Fed. Cir. 2007) ............................................................................................... 5

*Baldwin Graphic Sys., Inc. v. Siebert, Inc.*,
    512 F.3d 1338 (Fed. Cir. 2008) ........................................................................................... 11

*Comark Commc'ns, Inc. v. Harris Corp.*,
    156 F.3d 1182 (Fed. Cir. 1998) ............................................................................................. 5

*Cont'l Circuits LLC v. Intel Corp.*,
    915 F.3d 788 (Fed. Cir. 2019) ............................................................................................... 5

*Convolve, Inc v. Compaq Comput. Corp.*,
    812 F.3d 1313 (Fed. Cir. 2016) ........................................................................................... 11

*Littelfuse, Inc. v. Mersen USA EP Corp.*,
    29 F.4th 1376 (Fed. Cir. 2022) ........................................................................................... 14

*Markman v. Westview Instruments, Inc.*,
    52 F.3d 967 (Fed. Cir. 1995) ................................................................................................. 4

*Merck & Co. v. Teva Pharms. USA, Inc.*,
    395 F.3d 1364 (Fed. Cir. 2005) ........................................................................................... 10

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005) .................................................................................... 4, 5, 10

*Playtex Prods., Inc. v. Procter & Gamble Co.*,
    400 F.3d 901 (Fed. Cir. 2005) ............................................................................................... 6

*PPG Indus. v. Guardian Indus.*,
    156 F.3d 1351 (Fed. Cir. 1998) ............................................................................................. 6

*Salazar v. AT&T Mobility LLC*,
    64 F.4th 1311 (Fed. Cir. 2023) ........................................................................................... 11

*Salazar v. AT&T Mobility LLC*,
    Civ. A. No. 2:20-cv-00004-JRG, 2020 WL 5608640 (E.D. Tex. Sept. 8, 2020) ....................... 11

*SimpleAir, Inc. v. Sony Ericsson Mobile Commc'ns AB*,
    820 F.3d 419 (Fed. Cir. 2016) ............................................................................................. 10

*Teleflex, Inc. v. Ficosa N. Am. Corp.*,
    299 F.3d 1313 (Fed. Cir. 2002) ............................................................................................. 5

*Thorner v. Sony Comput. Ent. Am. LLC*,
    669 F.3d 1362 (Fed. Cir. 2012) ............................................................................................. 4

*U.S. Surgical Corp. v. Ethicon, Inc.*,
    103 F.3d 1554 (Fed. Cir. 1997) ............................................................................................. 4

*Voice Tech Corp. v. Unified Pats., LLC*,
  110 F.4th 1331 (Fed. Cir. 2024) .......................................................................................... 10

*Williamson v. Citrix Online, LLC*,
  792 F.3d 1339 (Fed. Cir. 2015) .......................................................................................... 15

## I.    INTRODUCTION

Plaintiff LS Cable & System Ltd. ("LS Cable") brought this case against Apple Inc. ("Apple") seeking to resolve an ongoing dispute between the parties that began over six years ago when LS Cable first notified Apple of its infringement of U.S. Patent No. 8,013,568 (the "'568 Patent" or the "Asserted Patent").  The asserted claims of the '568 Patent presently include Claims 1, 3, 7–9, 11–12, 30–34, 48–50, 52–56, and 58.  Relevant to this brief, Apple has identified five terms it believes are necessary to construe, some presently asserted in the case and, incredulously, some not presently asserted in this case.  In doing so, Apple seeks to construe a number of claims that, post-reexamination of the '568 Patent, do not exist.

Conversely, LS Cable contends that the terms are facially clear and Apple's non-infringement driven constructions need not be adopted.  Moreover, Apple's attempt to back-door theories that it could and should have raised in its initial brief, and failed to, should not be permitted.  In December 2025, the Court granted LS Cable's opposed motion for leave to file its amended infringement contentions, and the Court stated that "the parties may propose to file new claim construction briefs *if warranted*."  Dkt. 57.  During the hearing in December 2025, Apple represented that additional claim construction *might* be needed to address newly asserted claims.  However, Apple now seeks to cure deficiencies the Court found with its motion to dismiss, *after the Court denied its motion to dismiss*.  Despite acknowledging that the sole basis for its motion to dismiss was a claim construction issue (*see* Dkt. No. 58), Apple failed to initially raise the issue during claim construction, and it should not be afforded a re-do now.

### A.  The '568 Patent

The '568 Patent relates to a wireless charging system for a mobile communication terminal utilizing electromagnetic wave generation and intercepting technology, and is "capable of solving an overvoltage state by means of a wireless feedback control."  Ex. A ('568 Patent) at Abstract.  This charging may be accomplished by way of a charger body that receives power from a power supply, converts it to wireless form for transmission, and then transmits that power to a receiver, as well as a receiver that can receive a wireless power transmission and convert it back to AC current to provide a charge to a connected battery.  Ex. A, 7:13-36.

The '568 Patent identifies certain problems with conventional charging systems, explaining that the conventional wired charging systems include "exposed" contact and charging terminals resulting in faster corrosion and contamination. Ex. A, 1:38-49. The '568 Patent sought to address these problems by providing a contact-less battery charging system in which a charger wirelessly transmits power to a battery, and the battery includes circuitry to regulate and monitor charging for safe and efficient operation. Specifically, the battery incorporates a microprocessor to monitor voltages along the charging path and, through a microprocessor and wireless transmitting unit, communicate adjustment signals to the charger to prevent overvoltage. Ex. A, 7:42-61. This arrangement allows the battery to receive safe, regulated charging without requiring physical coupling between the charger and battery.

While the '568 Patent describes its inventions in various terms, in all cases it uses ordinary English-language to explain how the inventors designed a "contact-less chargeable battery and charging device capable of preventing any damage of an internal battery circuit together with solving a restriction for relative positions between the chargeable battery and the charging device when charging the battery in a contact-less charging method." Ex. A, 3:29-43. The claim terms clearly and unambiguously recite aspects of the inventions claimed in the '568 Patent.

During prosecution and throughout the specification itself, there is no evidence that the applicant ever intended to deviate from the ordinary and customary meaning of the terms used in the claims. There is no evidence of any efforts to define any term to ascribe a meaning different than the ordinary and customary meaning. There is no evidence of any efforts to disclaim any aspect of any claim term. The terms are facially clear. For the reasons explained, these terms should be accorded their plain and ordinary meaning in the remainder of this case.

### B. The Parties' Claim Construction Positions

Apple proposes specific constructions for six distinct disputed claim terms, totaling eight disputed constructions. LS Cable disagrees and contends that all disputed claim terms are facially clear and should be accorded their plain and ordinary meaning. Apple has not, and cannot, identify any reason to deviate from the ordinary and customary meaning of these terms, which is the default approach to claim interpretation. Therefore, Apple's proposed constructions should not be adopted.

The table below lists the terms in dispute and summarizes each party's respective construction, which form the basis for the briefing.

| DISPUTED CONSTRUCTIONS | | |
|---|---|---|
| **Claim Term (Asserted Independent Claims)** | **LS Cable's Proposed Construction** | **Apple's Proposed Construction** |
| "at both ends" (Claims 1, 7, 48) | Plain and ordinary meaning | "at the front end and at the rear end" |
| "a microprocessor" (Claims 1 and 48) | Plain and ordinary meaning | "one microprocessor that performs both the monitoring of both the detected voltages and also the transmitting a monitoring result" |
| "a microprocessor" (Claim 7) | Plain and ordinary meaning | "one microprocessor that performs both the monitoring of both voltages and also the wirelessly transmitting a monitoring result" |
| "a microprocessor" (Claim 58) | Plain and ordinary meaning | "one microprocessor that performs both the monitoring of both voltages and also the transmitting a monitoring result" |
| "an overvoltage monitoring unit for monitoring voltages at both ends of the constant voltage/constant current supplier and transmitting a monitoring result to the external contactless charging device by means of wireless communication" (Independent pre-reexamination[1] Claims 1, 7, and 21) | Plain and ordinary meaning | Means-plus-function term under 35 U.S.C. § 112(6). Function: Monitoring for overvoltages at both ends of the voltage/constant current supplier and transmitting a monitoring result to the external contact-less charging device by means of wireless communication. Corresponding Structure: Monitoring…: two voltage detectors and a microprocessor. Transmitting…: a 10– 15MHz modulator, a photo coupler, and an antenna |
| "an overvoltage monitoring unit detecting first and second voltages at both ends of the constant voltage/constant current supplier, monitoring the detected voltages at both ends | Plain and ordinary meaning | Means-plus-function term under 35 U.S.C. § 112(6). Function: Detecting and monitoring for overvoltages at both ends of the voltage/constant current supplier and |

---

[1] Apple's attempt to construe claims that do not exist should be rejected. There is no subject matter jurisdiction over these claims that are void ab initio.

| | | |
|---|---|---|
| of the constant voltage/constant current supplier and transmitting a monitoring result to the external contactless charging device by means of wireless communication" (Independent post-reexamination claim 56) | | transmitting a monitoring result to the external contact-less charging device by means of wireless communication<br><br>Corresponding Structure:<br><br>Detecting and monitoring…: two voltage detectors and a microprocessor<br><br>Transmitting…: a 10- 15MHz modulator, a photo coupler, and an antenna |
| "an overvoltage monitoring unit" '568 patent, independent (Claims 1, 48, 54, 55, and 58) | Plain and ordinary meaning | "a unit for monitoring whether voltages exceed a predetermined reference value" |
| "monitoring result" '568 patent, independent (Claims 1, 7, 48, 54, 55, 56, and 58) | Plain and ordinary meaning | "result based on the monitored voltages from both ends of the constant voltage/constant current supplier" |

## II.    LEGAL FRAMEWORK

"[T]he court has the power and obligation to construe as a matter of law the meaning of language used in the patent claim." *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995).  However, claim construction "is not an obligatory exercise in redundancy."  *U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997).  Instead, it "is a matter of resolution of disputed meanings and technical scope, to clarify and when necessary to explain what the patentee covered by the claims, for use in the determination of infringement."  *Id.*

"It is a bedrock principle of patent law that the claims of a patent define the invention to which the patentee is entitled the right to exclude." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005).  Claim terms are generally given their ordinary and customary meaning, which is "the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." *Id.* at 1313.

"There are only two exceptions to this general rule: 1) when a patentee sets out a definition and acts as his own lexicographer, or 2) when the patentee disavows the full scope of a claim term either in the specification or during prosecution."  *Thorner v. Sony Comput. Ent. Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012).  For the first exception, if the patentee is acting as his own lexicographer, the patentee must "'clearly set forth a definition of the disputed claim term,'" and

"'clearly express an intent' to redefine the term" in either the specification or during prosecution. *Id.* Absent a clear articulation of a definition in the specification or prosecution history, this exception cannot apply.

For the second exception, the patentee's statements disavowing the full scope of a claim must represent "a clear disavowal of claim scope." *Id.* at 1366. In other words, "in order for prosecution disclaimer to attach, the disavowal must be both clear and unmistakable." *3M Innovative Props. Co. v. Tredegar Corp.*, 725 F.3d 1315, 1325 (Fed. Cir. 2013). A statement is not "a clear disavowal of claim scope," when "an applicant's statements are amenable to multiple reasonable interpretations . . ." *Id.* at 1326.

In addition to the claims themselves, the patent's specification and prosecution history may help in determining the meaning of claim terms; however, improper use of the specification and the prosecution history may lead to misconstruing the meaning of claim terms. "Although the specification may aid the court in interpreting the meaning of disputed claim language, particular embodiments and examples appearing in the specification will not generally be read in the claims." *Comark Commc'ns, Inc. v. Harris Corp.*, 156 F.3d 1182, 1187 (Fed. Cir. 1998). Thus, "the claims must be read in view of the specification, but limitations from the specification are not to be read into the claims." *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1326 (Fed. Cir. 2002).

Additionally, "because the prosecution history represents an ongoing negotiation between the PTO and the applicant, rather than the final product of that negotiation, it often lacks the clarity of the specification and thus is less useful for claim construction purposes." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1317 (Fed. Cir. 2005).

*Thorner* has been guiding Federal Circuit precedent since its adoption. *See Cont'l Circuits LLC v. Intel Corp.*, 915 F.3d 788, 797 (Fed. Cir. 2019), *cert. denied*, 140 S. Ct. 648 (2019). Moreover, the mere fact that a dispute exists between the parties does not require the adoption of Defendants' limiting constructions, or any explicit construction for that matter. *Id.* Even where a dispute exists, the proper construction can, and often is, "plain and ordinary meaning."

Finally, "a sound claim construction need not always purge every shred of ambiguity." *Acumed LLC v. Stryker Corp.*, 483 F.3d 800, 806 (Fed. Cir. 2007). Indeed, "after the court has

defined the claim with whatever specificity and precision is warranted by the language of the claim and the evidence bearing on the proper construction, the task of determining whether the construed claim reads on the accused product is for the finder of fact." *PPG Indus. v. Guardian Indus.*, 156 F.3d 1351, 1355 (Fed. Cir. 1998); *see also Playtex Prods., Inc. v. Procter & Gamble Co.*, 400 F.3d 901, 908 (Fed. Cir. 2005) ("The need to make a difficult factual determination does not allow the court to surrender material that the patentee clearly and rightfully claimed.").

## III.   LEVEL OF ORDINARY SKILL IN THE ART

Apple posits that the person of ordinary skill in the art ("POSA") has:

> A Bachelor's degree and a Master's degree in Electrical Engineering, Computer Engineering, Physics, or a related field, as well as one to two years of academic or industry experience in power electronics or battery charging or comparable industry experience.

Ex. B (*Apple Inc. v. LS Cable & System Ltd.*, IPR2025-01141, Paper 2) at 2-3. LS Cable does not dispute Apple's definition of the POSA for the purposes of this exercise, and therefore believes there is no meaningful dispute as to the governing level of ordinary skill in the art that needs to be resolved at this time.

## IV.   ARGUMENT

### A. Apple's Belated Attempt to Inject New, but Previously Available, Claim Construction Disputes Is Improper

As a threshold matter, Apple's attempt to inject new claim construction disputes, based on an alleged claim-broadening theory it chose not to pursue during the original claim construction process, is procedurally improper and waived. LS Cable reserves all rights to seek to strike any such arguments to the extent Apple attempts to advance them in connection with claim construction of the originally asserted claims.

Apple alleged that certain claims were impermissibly broadened during reexamination in a motion to dismiss on March 10, 2025. Dkt. No. 29. At that time, Apple expressly acknowledged that its arguments were claim-construction dependent. Dkt. No. 58. Yet despite that acknowledgement, Apple did not identify any allegedly broadened claim terms in its original Patent Local Rule 4-1 disclosures, nor did it seek construction of those terms in its Patent Local Rule 4-2 disclosures or its claim construction briefing. *See* Ex. C, Defendant Apple Inc.'s Proposed Terms

for Construction Pursuant to Patent L.R. 4-1 (June 17, 2025); Ex. D, Defendant Apple Inc.'s Patent L.R. 4-2 Preliminary Claim Constructions and Identification of Extrinsic Evidence (July 8, 2025); Dkt. Nos. 39, 43.

The Court denied Apple's motion to dismiss, concluding that "[a]s Apple acknowledges, whether claims have been enlarged is usually a matter of claim construction." *See* Dkt. No. 58. Critically, that ruling issued after Apple had already submitted its claim construction brief, thereby confirming the scope of the claim construction disputes Apple elected to present on the originally asserted claims. Having failed to timely identify the relevant claim terms or seek their construction when it had every incentive and opportunity to do so, Apple waived the ability to resurrect that same theory through belated claim construction positions.

Apple now contends that the term "overvoltage monitoring unit," as it appears in both pre-reexamination claims and reexamined claims, requires construction. *See* Dkt. No. 69. But these terms were available for construction during the original claim construction process, and Apple offers no legitimate explanation for its failure to identify them earlier, particularly given that Apple had already advanced, and lost, a claim-construction-dependent theory premised on alleged claim broadening.

The Court's Scheduling Order authorizing amended claim construction does not provide Apple with a second bite to cure its failed claim construction arguments. Dkt. No. 67. Rather, it permits the parties to address claim terms appearing for the first time in newly asserted claims— terms that could not have been identified earlier—while ensuring that the Court is not burdened with unnecessary or duplicative claim construction disputes. Apple should not be permitted to revive waived constructions or to relitigate theories previously rejected in a different procedural posture.

LS Cable raises this issue to preserve its position and to make clear that it reserves the right to seek appropriate relief, such as in a motion to strike, should Apple attempt to advance untimely constructions or repackage its waived claim-broadening theory under the guise of amended claim construction.

### B. Disputed Claim Terms

#### i. "at both ends" (Claims 1, 7, 48, 54, 55, 56, and 58)

Apple alleges the term "at both ends" should be construed as "at the front end and at the rear end," seemingly referring solely to the literal and physical input and output terminals located on opposite sides of the constant voltage/constant current supplier. In other words, Apple appears to advance an interpretation that suggests detecting voltages at the ends of a box, i.e., at physical locations on opposite sides of the constant voltage/constant current supplier. In doing so, Apple ignores the plain and ordinary meaning of the term as understood by a POSA, who would read the term in the context of the claimed contact-less charging system.

The claim language itself, when considered with the specification and other claims, makes clear that "at both ends" refers to functional measurement points along the charging path at which voltages are monitored to control charging and prevent overvoltage. Specifically, one end is a functional point that occurs at some point following the secondary coil (i.e., receiver coil), where incoming voltage is measured before regulation, upstream of the constant voltage/constant current supply. The second end is a second functional point that occurs downstream of the constant voltage/constant current supplier. Monitoring these points allows the charging system to detect overvoltage conditions and adjust charging in real time, which is precisely described throughout the specification and claimed in independent Claims 1, 7, and 48. For example, the '568 Patent's specification describes detecting voltages "at both ends" as:

> Preferably, the operation of monitoring voltages at both ends of the constant voltage/constant current supplier 290 is conducted in a way of measuring *a front end voltage $V_{pp}$ and a rear end voltage $V_{ch}$* of the constant voltage/constant current supplier 290 and then checks whether a difference between them exceeds a criterion value.

Ex. A, 7:50-55.

> The voltage comparison result is a difference value of the first and second voltages, or a state of voltages at both ends, which indicates whether an overvoltage is applied. In the later case, the voltage comparator 380 compares a reference voltage difference for an overvoltage state with a difference between the first and second voltages.

*Id.* at 8:42-47; *see also id.* at Figure 5 (reproduced below).



*Id.* at Figure 5.

> The voltage state is voltages at both ends of the constant voltage/constant current supplier 290, ***or a difference of the voltages***. This voltage state may be input from the voltage comparator 380, or obtained by operating measured voltages $V_{pp}$, $V_{ch}$ input from the first and second voltage detectors 340, 360.

Ex. A, 12:4-9.

Nothing in the specification requires that this otherwise clear claim language needs to be confined to only "at the front end and at the rear end," as Apple contends.

Rather, these disclosures confirm that "at both ends" refers to the start and end of the regulated charging path and includes measurements along that path (so long as the measurements are taken on both sides of the constant voltage/constant current supplier component) and not to the physical terminals of the constant voltage/constant current supplier component.

This interpretation aligns with the specification's emphasis on monitoring the voltage drop across the charging path to detect and control for conditions so that the voltage across the constant voltage/constant current supplier may be controlled to a suitable level, supporting a plain and ordinary meaning construction consistent with the disclosed embodiments and system operation. In other words, "at both ends" refers to points along the charging path rather than confined to the physical terminals of the constant voltage/constant current supplier component.

Additionally, certain dependent claims in the '568 Patent aid in determining the meaning of

"at both ends." *See Phillips*, 415 F.3d at 1314-15 ("Other claims of the patent in question, both asserted and unasserted, can also be valuable sources of enlightenment as to the meaning of a claim term. Because claim terms are normally used consistently throughout the patent, the usage of a term in one claim can often illuminate the meaning of the same term in other claims." (internal citations omitted)). For example, while independent Claims 1 and 7 recite, in part, "monitoring voltages at both ends of the constant voltage/constant current supplier," dependent Claims 27 and 32, which depend from Claims 1 and 7, respectively, recite: "wherein the constant voltage/constant current supplier **has a front end and a rear end**." The additional limitation, "a front end and a rear end," in the dependent claims "gives rise to a presumption that the limitation in question is not present in the independent claim." *Id.* at 1315.

Additionally, Apple's proposed construction "would improperly impute other limitations into the claim term, rendering [the dependent claim] limitations superfluous." *Voice Tech Corp. v. Unified Pats., LLC*, 110 F.4th 1331, 1343 (Fed. Cir. 2024) (rejecting proposed construction that "incorporate[s] the steps recited in claim limitation [1.3] (deciding and selecting) directly into claim limitation [1.1] (receiving), thereby leaving claim limitation [1.3] no work to do") (citing *SimpleAir, Inc. v. Sony Ericsson Mobile Commc'ns AB*, 820 F.3d 419, 429 (Fed. Cir. 2016) ("[I]nterpretations that render some portion of the claim language superfluous are disfavored.")); *Merck & Co. v. Teva Pharms. USA, Inc.*, 395 F.3d 1364, 1372 (Fed. Cir. 2005) ("A claim construction that gives meaning to all the terms of the claim is preferred over one that does not do so.").

A POSA would understand Apple's proposed construction–limiting where voltages are detected to the physical front end and physical rear end of the constant voltage/constant current supplier–ignores the various places where voltage drops critical to feedback and charging control are measured, and therefore would not accurately reflect the scope of the claimed invention.

As Apple can identify no instances of lexicography or disavowal, and as Apple's own proposed construction is facially irreconcilable with the dependent claims of the '568 Patent, Apple's proposed construction should be rejected and the plain and ordinary meaning of the term should govern.

### ii.    "a microprocessor" (Claims 1 and 48)

Apple alleges the term "a microprocessor" should be construed as "one microprocessor that performs both the monitoring of both the detected voltages and also the transmitting a monitoring result."  Apple's proposed construction improperly narrows the scope of the claim by requiring one, and only one, microprocessor, which is neither compelled by the claim language nor required by the specification.  The Federal Circuit "has repeatedly emphasized that an indefinite article 'a' or 'an' in patent parlance carries the meaning of 'one or more' in open-ended claims containing the transitional phrase 'comprising.'"  *Baldwin Graphic Sys., Inc. v. Siebert, Inc.*, 512 F.3d 1338, 1342-43 (Fed. Cir. 2008).  The claims at issue in this case are comprising claims.

"The exceptions to this rule are ***extremely limited***: a patentee must evince a clear intent to limit 'a' or 'an' to 'one.'"  *Convolve, Inc v. Compaq Comput. Corp.*, 812 F.3d 1313, 1321 (Fed. Cir. 2016) (emphasis added).  The '568 Patent and its prosecution history evidence no such intent.

Here, the claims employ open-ended language regarding the overvoltage monitoring unit– "includes" and "a microprocessor"–that denotes non-exclusive listing of components within the overvoltage monitoring unit.  This claim language is unlike the disputed terms in, for example, *Salazar v. AT&T Mobility LLC*, where the Federal Circuit held that "the district court properly interpreted 'a microprocessor for generating …, said microprocessor creating …, a plurality of parameter sets retrieved by said microprocessor …, said microprocessor generating …' to mean 'one or more microprocessors, at least one of which is configured to perform the generating, creating, retrieving, and generating functions.'"  64 F.4th 1311, 1317 (Fed. Cir. 2023).  The '568 Patent claims do not subsequently recite additional limitations adding requirements that must be met by "said microprocessor," nor do the claims "repeatedly introduce[] ['a microprocessor'] using '***said*** microprocessor.'"  *Salazar v. AT&T Mobility LLC*, Civ. A. No. 2:20-cv-00004-JRG, 2020 WL 5608640, at *19 (E.D. Tex. Sept. 8, 2020).  Rather, the "claim-recited characteristics are [] just a simple listing of functions to be performed by 'a microprocessor.'"  *Id.*  Rather, the '568 Patent claims introduce the claimed microprocessor consistent with the normal patent parlance of "a", meaning "one or more" and there are no limitations in the claims that suggest a need to deviate from that open-ended interpretation.

Further, the specification does not support Apple's proposed construction that the microprocessor itself directly "performs" the wireless transmission of the monitoring result, whereby Apple's proposed construction appears to seek a construction requiring a microprocessor itself be capable of wireless transmission. Instead, the microprocessor's role involves "output[ting] an adjustment request signal of the charging power to the wireless transmitting unit 320," and the "wireless transmitting unit 320 receives the adjustment request signal of the charging power output from the microprocessor 310, and then modulates the adjustment request signal and wirelessly transmits it to the antenna 220 of the wireless receiving unit 230 provided to the charging device C through the antenna 330." Ex. A, 7:45-60. Accordingly, while the microprocessor indirectly facilitates the wireless transmission of a monitoring result via the wireless transmitting unit 320, the microprocessor does not itself "perform … the transmitting a monitoring result to the external contact-less charging device by means of wireless communication" as Apple's proposed construction requires. The claims of the '568 Patent encompass the described multi-processor system (e.g., one microprocessor for receiving and a second microprocessor for transmitting), and the claim's recitation of "a" microprocessor simply means one or more microprocessors. Apple's proposed construction would exclude that embodiment.

A POSA would understand that the microprocessor coordinates or controls the transmitting a monitoring result to the external charging device, but the physical act of transmission by wireless communication is performed by a separate component, the wireless transmitting unit, which itself passes a signal to an antenna (e.g., antenna 330) for actual transmission. *See, e.g.*, Ex. A, 7:56-63. Therefore, the claim should not be construed to require the same microprocessor to "perform" both monitoring and transmission (wireless or otherwise).

As Apple can identify no instances of lexicography or disavowal, and as Apple's own proposed construction seeks to introduce an impossibility, that is itself inconsistent with the specification, Apple's proposed construction should be rejected and the plain and ordinary meaning of the term should govern.

### iii.   "a microprocessor" (Claim 58)

Apple proposes a slight variation to its construction of "a microprocessor" for Claim 58

relative its proposal for Claims 1 and 48, but this construction fares no better.  Apple alleges that Claim 58's recitation of the term "a microprocessor" should be construed as "one microprocessor that performs both the monitoring of both voltages and also the transmitting a monitoring result." For the same reasons discussed above with respect to "a microprocessor" in Claims 1 and 48, Apple's proposed construction for this term is improper, and this claim term should be given its plain and ordinary meaning.

### iv.   "a microprocessor" (Claim 7)

Apple proposes a slight variation to its construction of "a microprocessor" for Claim 7 relative its proposal for Claims 1 and 48, but this construction fares no better.  Apple alleges that Claim 7's recitation of the term "a microprocessor" should be construed as "one microprocessor that performs both the monitoring of both voltages and also the wirelessly transmitting a monitoring result."  For the same reasons discussed above with respect to Claims 1 and 48, Apple's proposed construction for this term is improper, and this claim term should be given its plain and ordinary meaning.

### v.   "an overvoltage monitoring unit" (Claims 1, 48, 54, 55, and 58)

Apple proposes to construe "overvoltage monitoring unit" as "a unit for monitoring whether voltages exceed a predetermined reference value."  Apple's proposed construction should be rejected because it (1) merely paraphrases a subset of the claim language without providing any meaningful clarification, (2) improperly strips the term of its structural and functional context of the patent, and (3) risks confusing the jury by suggesting a binary threshold-only operation that is inconsistent with the disclosed system.

As an initial matter, Apple's proposal adds nothing of substance.  When the meaning of a claim term, like the claim term at issue here, is clear from the intrinsic record, and the term would be readily understood by a POSA, claim construction is unnecessary.  *Eon Corp. IP Holdings LLC v. Silver Spring Networks, Inc.*, 815 F.3d 1314 (Fed. Cir. 2016) ("[T]here is ordinarily no obligation to provide a special definition for terms that have a widely understood ordinary meaning, as long as the court is persuaded that the patent uses the terms in that ordinary sense.").  Apple's construction simply restates that the unit "monitor[s]" for "overvoltage," which is already apparent

from the claim language itself. Apple's reordering of claim terms provides no assistance.

More fundamentally, Apple's construction improperly divorces the term from the way it is used in the claims and described in the specification. Apple's proposed construction improperly narrows the claims by requiring that overvoltage be determined solely by whether a voltage "exceed[s] a predetermined reference value." The claims themselves impose no such limitation. Instead, they describe an overvoltage monitoring unit that operates within a contact-less charging system, monitors voltages at both ends of a constant voltage/constant current supplier, evaluates a voltage state or voltage difference, and outputs a monitoring result used to control charging. Ex. A, 7:50–55; 8:42–47; 12:4–9. The specification explains that the overvoltage monitoring unit includes multiple components that cooperate to determine whether an overvoltage condition exists and to generate a monitoring result reflecting that condition. For example:

> Preferably, the operation of monitoring voltages at both ends of the constant voltage/constant current supplier 290 is conducted in a way of measuring *a front end voltage $V_{pp}$ and a rear end voltage $V_{ch}$* of the constant voltage/constant current supplier 290 and then checks whether a difference between them exceeds a criterion value.

Ex. A, 7:50-55.

Moreover, Apple's interpretation of the independent claims is inconsistent with the claims that depend therefrom. For example, dependent Claim 3 requires the comparison of two values and outputting the comparison result, thereby requiring independent Claim 1 to be broader than Apple's proposed construction. *See* Ex. A, Claim 3. Claim 1 must encompass at least Claim 3, by nature of its dependency. *See Littelfuse, Inc. v. Mersen USA EP Corp.*, 29 F.4th 1376, 1380 (Fed. Cir. 2022) ("By definition, an independent claim is broader than a claim that depends from it, so if a dependent claim reads on a particular embodiment of the claimed invention, the corresponding independent claim must cover that embodiment as well."). Apple's proposed construction would exclude Claim 3's comparison, and that would be improper. Rather, the plain language of the independent claims should govern, as there are multiple different ways to monitor for overvoltage beyond simply comparing to a threshold.

A POSA would readily understand "overvoltage monitoring unit" to be implemented using multiple cooperating components within a wireless charging system that monitors voltage

conditions to detect overvoltage events and generate a monitoring result, consistent with the claims and the specification. No further construction is necessary or appropriate. Accordingly, Apple's proposed construction should be rejected, and the term "overvoltage monitoring unit" should be given its plain and ordinary meaning.

> **vi.** **"an overvoltage monitoring unit for monitoring voltages at both ends of the constant voltage/constant current supplier and transmitting a monitoring result to the external contact-less charging device by means of wireless communication" (Pre-reexamination Claims 1, 7, and 21)**

Apple contends that the limitation "an overvoltage monitoring unit…" as it appears in unasserted claims must be construed under 35 U.S.C. § 112(6). That is incorrect for two reasons. *First*, these claims do not exist. Apple can make no argument that construing the unasserted claims that no longer exists is anything more than a request for an advisory verdict on the scope of unassertable patent claims.

*Second*, properly read, the claim language recites structural components and their interrelationship within a contact-less charging system, and therefore does not fall within § 112(6).

Because the claim limitation does not use the word "means," there is a presumption that § 112(6) does not apply. *See Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1349 (Fed. Cir. 2015). Apple bears the burden to overcome this presumption by showing that the challenged language fails to recite sufficient structure. The mere use of the word "means" in the phrase "by means of wireless communication" does not convert the claim element into a means-plus-function limitation, where the element itself—an "overvoltage monitoring unit"—recites structure and operates within a defined system. Apple cannot carry that burden here because the claim itself identifies concrete components and the architecture by which the "overvoltage monitoring unit" operates. Indeed, the claim recites first and second voltage detectors and a microprocessor and describes their operation within the charging system.

Read in context, the pre-reexamination claims describe a unit operating within a contact-less charging system to monitor voltages at both ends of a constant voltage/constant current supplier and to transmit a monitoring result to an external charging device. That language conveys structure to a POSA, particularly in the field of power-management and wireless charging systems, where

voltage monitoring and feedback control are implemented using known circuitry and control logic.

For example, the specification describes monitoring voltages "at both ends" by measuring voltages (e.g., $V_{pp}$ and $V_{ch}$), assessing a "difference" or "state," and generating a monitoring result used for feedback control within the wireless charging system. *See, e.g.*, Ex. A, 7:50–55; 8:42–47; 12:4–9. That disclosure is consistent with the claim's structural recitations (e.g., detectors and microprocessor), and a POSA would understand the claim language as describing a structured implementation of overvoltage monitoring in a charging system, not a free-floating functional "means." Apple reaches its § 112(6) argument only by collapsing multiple claim elements and structural recitations into a single, litigation-driven "function" that does not appear in the claim language. Section 112(6) therefore does not apply, and the term should be given its plain and ordinary meaning.

The Patent Office has already made the determination that the term "overvoltage monitoring unit" does ***not*** invoke § 112(6). *See* Ex. E, May 23, 2022 Response to Final Office Action; Ex. F, June 15, 2022 Advisory Action at 4-7 (Responding to Ex. E, finding "[t]he term 'Overvoltage monitoring unit' includes sufficient structure and the term would not invoke interpretation under 35 U.S.C. § 112 6th paragraph."); Ex. G, August 16, 2022 Advisory Action at 4-5 (finding "'Overvoltage monitoring unit' will not be interpreted under 35 U.S.C. § 112 sixth paragraph"). After this interpretation was confirmed by the Patent Office multiple times, the reissued claims issued, confirming Apple's position is incorrect and § 112(6) does ***not*** apply.

Even if § 112(6) does apply, Apple's proposed construction is unduly limiting. Apple proposes an unreasonably narrow function. The claimed overvoltage monitoring unit detects a first and second voltage at both ends of the constant voltage/constant current supplier. Apple proposes to limit this to detecting "overvoltages at both ends of the voltage/constant current supplier." There is no claimed requirement that overvoltage at both ends of the constant voltage/constant current supplier be detected, merely that voltage be monitored.

Additionally, the posited structure is unduly narrow. For example, related to the function of transmitting, Apple proposes limiting to a specific carrier frequency by way of introduction of a very narrow modulator. The specification is not so limited.

**vii.    "an overvoltage monitoring unit detecting first and second voltages at both ends of the constant voltage/constant current supplier, monitoring the detected voltages at both ends of the constant voltage/constant current supplier and transmitting a monitoring result to the external contact-less charging device by means of wireless communication" (Claim 56)**

Apple advances the same § 112(6) argument with respect to post-reexamination claim 56. That argument fails for the same reasons discussed above.  Like the pre-reexamination claims, Claim 56 is not expressed as "means for" performing a function and recites a structural unit operating within a defined contact-less charging system.  If anything, the reexamined language further specifies the operation of the overvoltage monitoring unit by expressly describing the detection of first and second voltages at both ends of the constant voltage/constant current supplier.

Reexamination did not transform a structural claim element into a means-plus-function limitation.  The specification disclosed the same voltage-monitoring architecture both before and after reexamination, and a POSA would understand the reexamined claims as describing the same type of structured overvoltage monitoring implementation described above.  Apple cannot plausibly contend that the same term denotes a structural unit in the reexamined claims but a means-plus-function limitation in the pre-reexamination claims.

LS incorporates by reference the same arguments as it makes for Claims 1, 7, and 21 for this term.  Accordingly, § 112(6) does not apply to the reexamined claims, and the term should likewise be given its plain and ordinary meaning.

**viii.    "monitoring result" (Claims 1, 7, 48, 54, 55, 56, and 58)**

Apple proposes to construe "monitoring result" as a "result based on the monitored voltages from both ends of the constant voltage/constant current supplier."  That construction should be rejected because it improperly narrows the claims by importing limitations not required by the claim text, and conflicts with the specification's description of the monitoring result.

Apple's proposed construction improperly limits the "monitoring result" to a result derived only from, or "based on," voltages measured at both ends of the constant voltage/constant current supplier.  The claims impose no such restriction, nothing tied to how the monitoring result must be derived, what information it must include, or that it must be limited solely to raw voltage values.

To the contrary, "monitoring result" has a plain and ordinary meaning as the output or information produced by a monitoring operation. As described in the specification, the monitoring result may reflect a voltage state, an overvoltage condition, or other information used for feedback control, including adjustment or request signals transmitted to the external charging device. Ex. A, 8:42-47 ("The voltage comparison result is a difference value of the first and second voltages, or a state of voltages at both ends, which indicates whether an overvoltage is applied."); *id.* at 8:64-67 ("Here, the voltage comparison result is a voltage state signal indicating a difference value of both measured voltages or indicating whether or not in an overvoltage state."); *id.* at 11:13-18 ("[T]he microprocessor 310 outputs an adjustment request signal of charging power to the wireless transmitting unit 320. Then, the wireless transmitting unit 320 modulates the adjustment request signal of charging power and then wirelessly transmits it to the charging device C through the antenna 330."); *id.* at 11:38-42 ("[T]he microprocessor 310 wirelessly transmits an adjustment request signal of charging power to the charging device C again so that the power of high frequency AC current applied to the primary coil 200 is lowered as much as a predetermined level once again."). Apple's proposed construction improperly narrows the term by limiting the monitoring result to information "based on" voltage values, and would exclude disclosed embodiments. This is disfavored and the term should be given its plain and ordinary meaning.

## V.    CONCLUSION

LS Cable respectfully asks this Court to reject Apple's insupportably narrow constructions for the terms addressed above and instead adopt LS Cable's proposal that the terms need not be construed and that the plain and ordinary meaning of the terms be adopted.

Dated: April 7, 2026                    Respectfully submitted,

                                        */s/ Erik J. Halverson*
                                        Erik J. Halverson (SBN 333492)
                                        **K&L GATES LLP**
                                        4 Embarcadero Center, Suite 1200
                                        San Francisco, CA 94111
                                        Telephone: (415) 882-8200
                                        Fax: (415) 882-8220
                                        erik.halverson@klgates.com

                                        Jason A. Engel (*pro hac vice*)
                                        Rebekah Hill (*pro hac vice*)
                                        **K&L GATES LLP**
                                        70 W. Madison St., Suite 3300
                                        Chicago, IL 60602
                                        Telephone: (312) 372-1121
                                        Fax: (312) 827-8000
                                        jason.engel@klgates.com
                                        rebekah.hill@klgates.com

                                        *Attorneys for Plaintiff LS Cable & System Ltd.*