RICHARD S.J. HUNG (CA SBN 197425)
RHung@mofo.com
SHAELYN K. DAWSON (CA SBN 288278)
ShaelynDawson@mofo.com
MEREDITH L. ANGUEIRA (CA SBN 333222)
MAngueira@mofo.com
TANNYR M. PASVANTIS (CA SBN 353511)
TPasvantis@mofo.com
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, California 94105-2482
Telephone:    (415) 268-7000
Facsimile:    (415) 268-7522

RYAN J. MALLOY (CA SBN 253512)
RMalloy@mofo.com
MORRISON & FOERSTER LLP
707 Wilshire Boulevard
Los Angeles, California 90017-3543
Telephone:    (213) 892-5200
Facsimile:    (213) 892-5454

*Attorneys for Defendant*
APPLE INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| LS CABLE & SYSTEM LTD., <br><br> Plaintiff, <br><br> v. <br><br> APPLE INC., <br><br> Defendant. | Case No. 3:24-cv-09194-JD <br><br> **APPLE INC.'S AMENDED RESPONSIVE CLAIM CONSTRUCTION BRIEF** <br><br> Date: TBD <br> Time: TBD <br> Courtroom: 11, 19th Floor <br> Judge: Hon. James Donato <br><br> Action Filed: December 18, 2024 <br> Trial Date: July 12, 2027 |

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ................................................................................................ 1

II.   LS CABLE'S ASSERTED PATENT AND REEXAMINATION...................................... 1

    A.    The Claimed Invention.............................................................................. 1

    B.    The Reexamination Proceedings................................................................ 1

III.  PRINCIPLES OF CLAIM CONSTRUCTION .......................................................... 2

IV.   APPLE'S IDENTIFICATION OF ADDITIONAL CLAIM TERMS IS
      PROCEDURALLY PROPER, TIMELY, AND NOT PREJUDICIAL ............................. 2

V.    PROPER CONSTRUCTION OF DISPUTED CLAIM TERMS ....................................... 3

    A.    Term 1 ("at both ends") (claims 1, 7, 48, 54, 55, 56, 58) ........................ 3

    B.    Term 2A ("a microprocessor") (claims 1 and 48)..................................... 6

        1.    The Plain Claim Language Requires Apple's Construction ........................ 7

        2.    The Specification Confirms Apple's Construction .................................... 8

        3.    The Reexamination Confirms Apple's Construction ................................. 9

    C.    Term 2B ("a microprocessor") (claim 7) ................................................ 11

    D.    Term 2C ("a microprocessor") (claim 58) .............................................. 12

    E.    Term 3 ("an overvoltage monitoring unit for …") (pre-reexam claims 1, 7, 21) .. 12

        1.    Means-Plus-Function Under 35 U.S.C. § 112(6) Applies ........................ 13

        2.    Function and Corresponding Structures...................................... 15

    F.    Term 4 ("an overvoltage monitoring unit for …") (reexamined claim 56) ........... 17

    G.    Term 5 ("an overvoltage monitoring unit") (claims 1, 48, 54, 55, and 58) ........... 18

    H.    Term 6 ("monitoring result") (claims 1, 7, 48, 54, 55, 56, and 58) ...................... 19

VI.   CONCLUSION.................................................................................................. 20

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Baldwin Graphic Sys., Inc. v. Siebert, Inc.*,
    512 F.3d 1338 (Fed. Cir. 2008)................................................................................................ 7

*Convolve, Inc. v. Compaq Comput. Corp.*,
    812 F.3d 1313 (Fed. Cir. 2016)................................................................................................ 7

*Diebold Nixdorf, Inc. v. Int'l Trade Comm'n*,
    899 F.3d 1291 (Fed. Cir. 2018).............................................................................................. 14

*Facebook, Inc. v. BlackBerry Ltd.*,
    No. 18-cv-05434, 2019 WL 8013872 (N.D. Cal. Sep. 17, 2019) ............................................ 3

*Gemalto S.A. v. HTC Corp.*,
    754 F.3d 1364 (Fed. Cir. 2014)................................................................................................ 2

*General American Transportation Corp. v. Cryo-Trans, Inc.*,
    93 F.3d 766 (Fed. Cir. 1996)............................................................................................... 5, 6

*Howmedica Osteonics v. Tranquil Prospects*,
    401 F.3d 1367 (Fed. Cir. 2005)................................................................................................ 5

*Merck & Co. v. Teva Pharms. USA, Inc.*,
    395 F.3d 1364 (Fed. Cir. 2005)................................................................................................ 5

*Neword, LLC v. Centraal Corp.*,
    242 F.3d 1347 (Fed. Cir. 2001)................................................................................................ 2

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005) (*en banc*) ............................................................................. 2

*Predicate Logic, Inc. v. Distributive Software, Inc.*,
    544 F.3d 1298 (Fed. Circ. 2008) ........................................................................................... 12

*Salazar v. AT&T Mobility LLC.*,
    64 F.4th 1311 (Fed. Cir. 2023)............................................................................................. 7, 8

*Sunovion Pharms., Inc. v. Teva Pharms. USA, Inc.*,
    731 F.3d 1271 (Fed. Cir. 2013)................................................................................................ 2

*Trs. of Columbia Univ. v. Symantec Corp.*,
    811 F.3d 1359 (Fed. Cir. 2016)................................................................................................ 2

*In re Varma*,
    816 F.3d 1352 (Fed. Cir. 2016)................................................................................................ 8

*Williamson v. Citrix Online, LLC,*
    792 F.3d 1339 (Fed. Cir. 2015) ......................................................................................... 14

**Statutes**

35 U.S.C. § 112 ...................................................................................................................... 10

35 U.S.C. § 112(6) ........................................................................................................... *passim*

## I.    INTRODUCTION

LS Cable's repeated invocation of "plain and ordinary meaning"—without saying what that meaning *is*—gives the Court and jury no meaningful guidance.  Adopting LS Cable's construction would allow it to twist the claims of the asserted patent, U.S. Patent No. 8,013,568 ("the '568 patent"), to try to cover circuits it never invented.

Apple's constructions, by contrast, are grounded in the intrinsic and extrinsic record and would resolve the parties' disputes, including whether the post-reexamination claims are broader than the properly construed pre-reexamination claims.  LS Cable's desire to exclude Apple's constructions—despite their timeliness, their responsiveness to LS Cable's amended contentions, and their lack of prejudice—reinforces that the Court should reach them.

## II.    LS CABLE'S ASSERTED PATENT AND REEXAMINATION

### A.    The Claimed Invention

The '568 patent describes battery-charging circuitry and methods of "solving an overvoltage state by means of a wireless feedback control."  (ECF No. 72-1 at 1:22–24.)  The patent discloses "a contact-less charging device that transmits a charging power to a contact-less chargeable battery by means of electromagnetic induction phenomenon." (*Id*. at 3:63–66.)  Battery protection occurs via an "overvoltage monitoring unit" that "detect[s] voltages at front and rear ends of the constant voltage/constant current supplier" and "output[s] a monitoring result." (*Id*. at 4:27–37.)  "The microprocessor controls the constant voltage/constant current supplier to charge the battery cell, monitors whether an excessive voltage is applied to both ends of the constant voltage/constant current supplier, and outputs an adjustment request signal of the charging power to the wireless transmitting unit if an excessive voltage is applied." (*Id*. at 7:43–49 (reference numbers in figure omitted).)

### B.    The Reexamination Proceedings

Nearly 10 years after the '568 patent issued—and Apple's sales in the consumer electronics market flourished—LS Cable sought supplemental examination of the patent.  During the reexamination, the applicant substantially amended independent claims 1 and 7 to add the "microprocessor" limitation and added new independent claim 48 reciting a microprocessor, as

well.  The Examiner also found the phrase "overvoltage monitoring unit" in pre-reexamination claims 1, 7, and 21 to be subject to § 112(6).  After two non-final rejections, a final rejection, and an appeal, the U.S. Patent Office issued a reexamination certificate.  Apple discusses the reexamination proceedings in greater detail below.

## III.   PRINCIPLES OF CLAIM CONSTRUCTION

"When construing claim terms, we first look to, and primarily rely on, the intrinsic evidence, including the claims themselves, the specification, and the prosecution history of the patent, which is usually dispositive." *Sunovion Pharms., Inc. v. Teva Pharms. USA, Inc.*, 731 F.3d 1271, 1276 (Fed. Cir. 2013).  "The specification is always highly relevant to the claim construction analysis and is, in fact, the single best guide to the meaning of a disputed term." *Trs. of Columbia Univ. v. Symantec Corp.*, 811 F.3d 1359, 1363 (Fed. Cir. 2016) (internal quotation marks omitted); *see also Phillips v. AWH Corp.*, 415 F.3d 1303, 1315 (Fed. Cir. 2005) (*en banc*).  "[C]laims cannot be of broader scope than the invention that is set forth in the specification." *Gemalto S.A. v. HTC Corp.*, 754 F.3d 1364, 1369 (Fed. Cir. 2014).  Expert testimony "concerning the technological aspects of a patented invention may be of assistance to the court when dealing with complex technologies." *Netword, LLC v. Centraal Corp.*, 242 F.3d 1347, 1356 (Fed. Cir. 2001).

## IV.   APPLE'S IDENTIFICATION OF ADDITIONAL CLAIM TERMS IS PROCEDURALLY PROPER, TIMELY, AND NOT PREJUDICIAL

LS Cable's request to exclude certain terms or strike portions of Apple's briefing should be denied.  Apple timely exchanged all its terms for construction in accordance with the Court's amended scheduling order.  (ECF No. 67.)  That schedule imposes no restriction on which terms a party may identify for construction.  (*Id.*)  Rather, consistent with the Court's order permitting LS Cable to add new claims to its infringement contentions, the schedule expressly permits "new" claim construction briefs.  (ECF Nos. 57, 67.)

Apple identified the additional claim terms in response to two events post-dating the parties' initial claim construction exchanges and briefing.  ***First***, LS Cable amended its infringement contentions to assert new claims.  Because the newly asserted claims do not include

the terms Apple originally identified for construction, Apple added terms for construction that would help resolve the parties' disputes over the scope of the newly asserted claims.  This is consistent with common practice after amendment of contentions.  *See, e.g.*, *Facebook, Inc. v. BlackBerry Ltd.*, No. 18-cv-05434, 2019 WL 8013872, at *9 (N.D. Cal. Sep. 17, 2019) (permitting additional terms for construction to address amended contentions).  ***Second***, in its order concerning Apple's motion to dismiss, the Court noted its desire to evaluate Apple's claim broadening defense (*i.e.*, that LS Cable had impermissibly broadened its patent claims during reexamination) as part of the claim construction process.  (ECF No. 58.)  Apple therefore seeks construction of terms from the pre-reexamination claims to enable the Court to compare the scope of those original claims to the amended, post-reexamination claims.

LS Cable identifies nothing "procedurally improper" about Apple's identification of additional claim terms.  (ECF No. 72 LS Cable's Opening Br. ("LSC Op.") at 6–7.)  While LS Cable argues that Apple should have identified these additional terms previously, at the time of Apple's original claim construction briefing, Apple had no way of knowing that LS Cable would later assert new claims.  Nor had the Court issued its order on Apple's motion to dismiss.  Both events triggered these additional terms to become important.

Apple's addition of claim terms does not prejudice LS Cable.  Apple timely disclosed these terms via the Court's amended schedule, LS Cable deposed Apple's expert regarding these terms, and the *Markman* hearing—which the Court rescheduled due to LS Cable's amendment to its infringement contentions—remains over five weeks away.  LS Cable identified no potential prejudice in its opening brief and should not be allowed to do so for the first time on reply.

## V.   PROPER CONSTRUCTION OF DISPUTED CLAIM TERMS

### A.   Term 1 ("at both ends") (claims 1, 7, 48, 54, 55, 56, 58)

| Claim Language | LS Cable's Construction | Apple's Construction |
|---|---|---|
| "at both ends" | plain and ordinary meaning | "at the front end and at the rear end" |

The question for the Court is straightforward:  Does "at both ends" refer to the front end and the rear end of the constant voltage/constant current supplier, as Apple contends?  Or does it refer to any "functional measurement points along the charging path," regardless of how many

intervening elements exist between those "functional measurement points" and the constant voltage/constant current supplier, as LS Cable contends?

Apple's construction of "at both ends" states the term's plain and ordinary meaning:  at the front end and at the rear end of the physical component.  The specification is on all fours with Apple's construction.  It explains that "the operation of monitoring voltages *at both ends of the constant voltage/constant current supplier 290* is conducted in a way of measuring *a front-end* voltage $V_{PP}$ and *a rear end* voltage $V_{ch}$ *of the constant voltage/constant current supplier 290* and then check[ing] whether a difference between them exceeds a criterion value."  (ECF No. 72–1 at 7:50–55 (emphasis added).)

Figure 5 (annotated below) likewise shows first and second voltage detectors 350 and 360 at the front and rear ends (yellow) of constant voltage/constant current supplier 290 (blue) in "*the embodiment of the present invention.*"  (*Id.* at 8:29–31.)  The specification explains that "[t]he voltage comparison result is a difference value of the first and second voltages, or a state of voltages at both ends, which indicates whether an overvoltage is applied."  (*Id.* at 8:42–44.)  In all cases, the measurement is directed to the voltage drop over the constant voltage/constant current supplier, with no intervening structures between the voltage measurements and the constant voltage/constant current supplier.  By monitoring this drop, the circuit attempts to "prevent[] any damage of an internal battery circuit."  (*Id.* at 3:36–37.)



[Fig. 5]

Moreover, claim 12 recites:  "wherein the monitoring result is a difference of voltages at *front and rear ends of the constant voltage/constant current supplier*, voltage values of the

*front and rear ends*, or a code indicating that the voltages *at both ends* are in an overvoltage state." (emphasis added.)  Thus, the specification and claims clearly use "both ends" to refer to the actual front and rear ends "of the constant voltage/constant current supplier."

LS Cable identifies no support in the claim language or specification for its strained argument that the term can refer to "functional" points.  Its assertion that "at both ends" does not refer "solely to the literal and physical input and output terminals located on opposite sides of the constant voltage/constant current supplier" is equally unclear.  LS Cable does not explain what it means by "literal and physical" "terminals."  (*See* LSC Op. at 8.)  LS Cable apparently seeks to expand "at both ends" to cover any circuit in which one voltage detector is "upstream" of the constant voltage/constant current supplier and another is "downstream" of it.  But the plain ordinary meaning of "at both ends" refers to the points at the ends, not points far away.  For example, it would strain "plain and ordinary meaning" past breaking to say that Oregon and Mexico are "at both ends" of the Golden Gate Bridge.

LS Cable admits that the invention is focused on "monitoring the voltage drop across the charging path to detect and control for conditions so that the voltage across the constant voltage/constant current supplier may be controlled to a suitable level."  (LSC Op. at 9.)  Its argument that the measurement may occur at any point along the signal path would undermine that purpose, as the monitored voltage drop would no longer be specific to the constant voltage/constant current supplier.  That cannot be correct.  *See Howmedica Osteonics v. Tranquil Prospects*, 401 F.3d 1367, 1372 (Fed. Cir. 2005) (rejecting construction that would "defeat the purpose of the invention").  To continue with the Golden Gate Bridge analogy, monitoring traffic flow in Oregon and Mexico tells one nothing about the traffic flow on a bridge in San Francisco.

LS Cable's "plain and ordinary meaning" also would render the phrase "at both ends" superfluous.  Per LS Cable, it would allow the voltage measurements to occur at any point upstream or downstream, not just the "ends."  That also cannot be right.  *See Merck & Co. v. Teva Pharms. USA, Inc.*, 395 F.3d 1364, 1372 (Fed. Cir. 2005) ("A claim construction that gives meaning to all the terms of the claim is preferred over one that does not do so.").

*General American Transportation Corp. v. Cryo-Trans, Inc.* is instructive.  There, the

Federal Circuit reversed a construction of the phrase "openings . . . adjacent each of said side walls and end walls" that permitted openings "adjacent" to just the end walls.  93 F.3d 766, 770 (Fed. Cir. 1996).  The appellate court instead construed the phrase to "refer[] to structurally distinct openings that are provided adjacent to each of the railcar's four walls." *Id.*  It noted that the specification distinguished between openings adjacent to side walls and those adjacent to end walls.  It also noted that the disclosed embodiment and all figures described and depicted are "not just the preferred embodiment of the invention," but the "only" embodiment. *Id*.

As in *General American*, Figure 5 depicts "***the*** embodiment."  (ECF No. 72-1 at 8:29–31 (emphasis added).)  As in *General American*, LS Cable's expansive explanation of "plain and ordinary meaning" would read out "ends" and undercut the alleged invention's ability to monitor an overvoltage at the constant voltage/constant current supplier.  The Court thus should reject it.

Finally, LS Cable's claim differentiation argument based on claims 27 and 32 is misplaced.  Those claims recite that the "constant voltage/constant current supplier has a front end and a rear end" solely to provide antecedent bases for later limitations directed to the front end and rear end.  For example, claim 32 states:  "wherein the constant voltage/constant current supplier receives the DC current at the front end from the rectifier and supplies the charging power at the rear end to the battery cell."  These claims do not state that voltages are monitored at the front end and rear end, as a coherent claim differentiation argument would require.

The Court should adopt Apple's construction of "at both ends."

### B.    Term 2A ("a microprocessor") (claims 1 and 48)

| Claim Language | LS Cable's Construction | Apple's Construction |
|---|---|---|
| "a microprocessor" | plain and ordinary meaning | "one microprocessor that performs both the monitoring of both the detected voltages and also the transmitting a monitoring result" |

LS Cable incorrectly asserts that the claimed "microprocessor" can be satisfied by one microprocessor that performs only the monitoring of the detected voltages and a second component of any kind that performs only the transmitting of a monitoring result.  Apple's construction, on the other hand, applies the Federal Circuit's case law for claim language that

requires that one specified component perform multiple functions.

### 1. The Plain Claim Language Requires Apple's Construction

Claims 1 and 48's plain language requires that the recited "microprocessor" both monitor the "detected voltages" and transmit a "monitoring result." Apple's construction requiring both does not "narrow[] the scope of the claim," as LS Cable contends, but gives it the scope that the English language requires.

The relevant clauses in claims 1 and 48 contain one noun ("a microprocessor") and two present participles ("monitoring" and "transmitting"). Claims 1 and 48 require, as relevant here:

> . . . a microprocessor monitoring the detected voltages at both ends of the constant voltage/constant current supplier *and* transmitting a monitoring result to the external contact-less charging device by means of wireless communication so as to induce a change of intensity of the magnetic field . . .

There is no syntactically sensible way to read these clauses except as requiring one microprocessor that performs both actions.

LS Cable's reliance on *Baldwin Graphic Sys., Inc. v. Siebert, Inc.*, 512 F.3d 1338, 1342–43 (Fed. Cir. 2008) and *Convolve, Inc. v. Compaq Comput. Corp.*, 812 F.3d 1313, 1321 (Fed. Cir. 2016) as holding that "a" or "an" means "one or more" is misplaced. (*See* LSC Op. at 11.) As the claims here are open-ended "comprising" claims, nothing prevents their claim scope from covering devices with *additional* microprocessors, as long as at least one microprocessor performs the required tasks of "monitoring" *and* "transmitting."

The Federal Circuit explained why in its 2023 decision in *Salazar v. AT&T Mobility LLC*. There, the claims recited a "microprocessor" in which "said microprocessor" performed various activities. 64 F.4th 1311, 1313 (Fed. Cir. 2023). The patentee argued that "a correct claim construction [sh]ould encompass one microprocessor capable of performing one claimed function and another microprocessor capable of performing a different claimed function, even if no one microprocessor could perform all of the recited functions." *Id.* at 1315. The Federal Circuit disagreed. Although acknowledging that "a microprocessor" meant "one or more microprocessors" (citing the same cases as LS Cable, *Baldwin* and *Convolve*), the appellate court explained that it did "not suffice to have multiple microprocessors, each able to perform just one

of the recited functions." *Id*. at 1318.  Instead, "the claim language require[d] at least one microprocessor capable of performing each of the recited functions." *Id*.  As the court further explained by analogy:  "for a dog owner to have 'a dog that rolls over and fetches sticks,' it does not suffice that he have two dogs, each able to perform just one of the tasks." *Id*. (quoting *In re Varma*, 816 F.3d 1352, 1363 (Fed. Cir. 2016)).

LS Cable's attempt to distinguish *Salazar* is unpersuasive.  The fact that *Salazar*'s claim used the phrase "said microprocessor" did not underpin the court's reasoning.  *See id*. at 1315–18. The *Salazar* court's discussion of *Varma* makes this clear.  As the *Salazar* court noted, *Varma* concerned a "disputed claim limitation [that] was 'a statistical analysis request corresponding to two or more selected investments.'" *Id*. at 1317 (citing *Varma*, 816 F.3d at 1362).  The *Varma* court disagreed that a "limitation could be satisfied even if two statistical analysis requests were required to analyze the 'two or more selected investments.'" *Id*. (citing 816 F.3d at 1362). Aligning its conclusion with *Varma*, the *Salazar* court explained:

> *Varma* thus dealt with claim language that introduces a claim element using an indefinite article and further defines the element with subsequently recited functionality.  While this structure may allow for more than a single instance of the claim element, it may nonetheless require that a single instance of the element be capable of performing all the recited functionality.

(*Id*.)  Here, a "single instance of" "microprocessor" must "be capable of performing all the recited functionality." *See id*.  That all recited functionality ("monitoring" and "transmitting") appears in the same clause as the "microprocessor"—not in distinct clauses each preceded by "said"—does not distinguish the '568 patent's claims from *Salazar* or *Varma*.

### 2.  The Specification Confirms Apple's Construction

The specification confirms that a single microprocessor must perform both recited functions.  It explains that "***[t]he microprocessor 310*** controls the constant voltage/constant current supplier 290 to charge the battery cell 300, monitors whether an excessive voltage is applied to both ends of the constant voltage/constant current supplier 290, and outputs an adjustment request signal of the charging power to the wireless transmitting unit 320 if an excessive voltage is applied." (ECF No. 72-1 at 7:43–49 (emphasis added); *see also id.* at Fig. 5.) The specification further states that Figure 5 (below) is "***the*** embodiment of the present

APPLE'S AMENDED RESPONSIVE CLAIM CONSTRUCTION BRIEF
CASE NO. 3:24-CV-09194-JD

8

invention," not just one embodiment.  (*Id*. at 8:29–31 (emphasis added).)



[Fig. 5]

LS Cable misreads Apple's construction to require that the microprocessor itself have wireless transmission capability.  Not so.  Apple's construction does ***not*** preclude the microprocessor's use of a separate wireless transmitting unit.  This is consistent with the specification, which explains in discussing Figure 5:  "[I]f it is determined that an overvoltage is applied after monitoring voltages at both ends of the constant voltage/constant current supplier 290, ***the microprocessor 310 uses*** the wireless transmitting unit 320 to transfer an adjustment request signal of the charging power to the charging device."  (ECF No. 72-1 at 8:48–53 (emphasis added); *see also id.* at 10:55–58 and 11:13–18 (similar), 11:38–40 ("the microprocessor 310 wirelessly transmits an adjustment request signal of charging power to the charging device C").)

Under Apple's construction, sending an adjustment request signal (or other "monitoring result," as claimed) suffices to meet the claim limitation.  Consistent with the claim language and specification, however, Apple's construction does require that the microprocessor be responsible for both the monitoring and transmitting.

### 3.    The Reexamination Confirms Apple's Construction

The reexamination history reinforces Apple's construction requiring that the microprocessor perform both the monitoring of the voltages and the transmitting tasks.  Before the reexamination, claim 1 did not recite "a microprocessor."  (*See* ECF No. 72-1 at 15.)  Instead, it recited "an overvoltage monitoring unit for monitoring voltages . . . and transmitting a monitoring result."  (*See id*.)  The Examiner repeatedly rejected claim 1 for lacking sufficient

structure under 35 U.S.C. § 112. (*See, e.g.,* Ex. 1[1] at 19; Ex. 3 at 8-9.) After the second non-final rejection, the applicant amended claim 1 and added new claim 48[2] to recite specific structure—*a microprocessor*. Amended claim 1 states: "an overvoltage monitoring unit [for] that includes a microprocessor monitoring voltages . . . and transmitting a monitoring result …." (Ex. 2 at 2 (emphasis in original).) New claim 48 states: "an overvoltage monitoring unit that includes a wireless transmitting unit, first and second voltage detectors respectively detecting voltages at both ends of the constant voltage/constant current supplier, and a microprocessor monitoring the detected voltages . . . and transmitting a monitoring result…." (*Id.* at 13 (emphasis in original).)

As the applicant explained to the Examiner:

> Support for the claimed "overvoltage monitoring unit" is found at least at column 4, lines 14-45 (*e.g.,* "the overvoltage unit includes . . . a microprocessor") and column 7, line 43 to column 8, line 63 (*e.g.,* "microprocessor 310 . . . monitors whether an excessive voltage is applied . . . and outputs an adjustment request signal of the charging power to the wireless transmitting unit 320 if an excessive voltage is applied [ . . . ]").

(*Id.* at 27; *see id.* at 27–28.) Together, amended claim 1 and new claim 48 make clear that, while the purported invention could include a "wireless transmitting unit" (*see id.* at 13), the "microprocessor" performs both the "monitoring" and "transmitting" tasks.

After the final rejection, the applicant further amended claims 1 and 48 as shown below:

> an overvoltage monitoring unit [for] that includes first and second voltage detectors respectively detecting first and second voltages at both ends of the constant voltage/constant current supplier and a microprocessor monitoring the detected voltages at both ends of the constant voltage/constant current supplier and transmitting a monitoring result to the external contact-less charging device by means of wireless communication so as to induce a change of intensity of the magnetic field.

(Ex. 4 at 2 (twice amended claim 1).)

> an overvoltage monitoring unit that includes first and second voltage detectors respectively detecting voltages at both ends of the constant voltage/constant current supplier, and a microprocessor monitoring the detected voltages at both ends of the constant voltage/constant current supplier and transmitting a monitoring result to the external contact-less charging device by means of wireless communication so as to induce a change of intensity of the magnetic field.

(*Id.* at 14 (amended new claim 48).)

---

[1] All exhibits referenced are to the Declaration of Shaelyn K. Dawson.
[2] Claim 49 in the reexamination proceeding issued as asserted claim 48.

The applicant suggested that the microprocessor is a specific structure of the claimed "overvoltage monitoring unit." As it explained to the Examiner:

> With respect to claims 1, 4, 49, 52, 55, 65 and 66, Patent Owner submits that the claim recites specific structures for the "overvoltage monitoring unit." For example, claim 1 recites "an overvoltage monitoring unit that includes first and second voltage detectors [ . . . ] and *a microprocessor*."

(*Id*. at 27 (emphasis added).) Meanwhile, claim 48 no longer required a wireless transmitting unit—but it continued to require the microprocessor performing both the "monitoring" and "transmitting" actions. (*See id*. at 13.)

Contrary to LS Cable, Apple does not contend that the applicant acted as its own lexicographer or explicitly disavowed claim scope. (*See* LSC Op. at 12.) Instead, Apple's position is that the claims, specification, and applicant's reexamination amendments and arguments *confirm* the plain meaning, based on standard English syntax, of "a microprocessor."

### C.    Term 2B ("a microprocessor") (claim 7)

| Claim Language | LS Cable's Construction | Apple's Construction |
|---|---|---|
| "a microprocessor" | plain and ordinary meaning | "one microprocessor that performs both the monitoring of both voltages and also the wirelessly transmitting a monitoring result" |

For the same reasons as for claims 1 and 48 above, the plain language of claim 7 likewise requires that the recited microprocessor both monitor "voltages" and wirelessly transmit "a monitoring result." The relevant clause in claim 7 contains one noun ("a microprocessor") and two present participles ("monitoring" and "transmitting"). As amended during reexamination, claim 7 requires in relevant part:

> . . . a microprocessor monitoring voltages at both ends of the constant voltage/constant current supplier *and* wirelessly transmitting a monitoring result to the external contact-less charging device so as to induce a change of intensity of the magnetic field . . .

(ECF No. 72-1 at claim 7 (emphasis added).) As claim 7's language slightly differs from that of claims 1 and 48, Apple proposes constructions that track those differences. But as LS Cable's reliance on the same arguments confirms, Apple's proposals are substantively equivalent for claim 7 and claims 1 and 48. (*See* LSC Op. at 13.) The Court should adopt Apple's construction.

### D.    Term 2C ("a microprocessor") (claim 58)

| Claim Language | LS Cable's Construction | Apple's Construction |
| --- | --- | --- |
| "a microprocessor" | plain and ordinary meaning | "one microprocessor that performs both the monitoring of both voltages and also the transmitting a monitoring result" |

For the same reasons as for claims 1, 7, and 48 above, the plain language of claim 58 likewise requires that the recited microprocessor both monitor "both voltages" and transmit "a monitoring result."  As claim 58's language slightly differs from that of claims 1, 7, and 48, Apple proposes constructions that track those slight differences.  But as LS Cable's reliance on the same arguments confirms, Apple's proposals are substantively equivalent for claim 58 and claims 1, 7, and 48.  (*See* LSC Op. at 12–13.)  The Court should adopt Apple's construction.

### E.    Term 3 ("an overvoltage monitoring unit for …") (pre-reexam claims 1, 7, 21)

| Claim Language | LS Cable's Construction | Apple's Construction |
| --- | --- | --- |
| "an overvoltage monitoring unit for monitoring voltages at both ends of the constant voltage/constant current supplier and transmitting a monitoring result to the external contact-less charging device by means of wireless communication" | plain and ordinary meaning | Means-plus-function term under 35 U.S.C. § 112(6).<br><br>Function:  Monitoring for overvoltages at both ends of the voltage/constant current supplier and transmitting a monitoring result to the external contact-less charging device by means of wireless communication<br><br>Structure for "monitoring …":  two voltage detectors and a microprocessor<br><br>Structure for "transmitting…":  a 10–15 MHz modulator, a photo coupler, and an antenna |

Construction of this term is relevant to determining whether the claims were impermissibly broadened during reexamination, which is relevant to Apple's unenforceability defense under § 305.  *See Predicate Logic, Inc. v. Distributive Software, Inc.*, 544 F.3d 1298, 1302 (Fed. Circ. 2008) (using district court's construction of pre-reexamination claims to assess broadening); ECF No. 29.  LS Cable is therefore incorrect in suggesting that construction of the pre-reexamination claims would amount to "an advisory verdict."  (LSC Op. at 15).

In the context of the original claims prior to reexamination, this term appears in claim language that lacked any structure for performing the recited function. Therefore, the term, prior to reexamination, would have been understood as a means-plus-function term under § 112(6), and the structure required for performing the recited function is the combination of six components disclosed in the specification: two voltage detectors, a microprocessor, a 10–15 MHz modulator, a photo coupler, and an antenna. The claims subsequently were amended in reexamination to add directly into the claim language three of those components (the two voltage detectors and microprocessor). As a result, this term, in the context of the post-reexamination claims, no longer would have been understood as means-plus-function because the claims now recited some structure. However, the post-reexamination claims omitted and no longer required three of the structural components required in the original claims (the 10–15 MHz modulator, photo coupler, and antenna). Thus, proper construction of this term in the context of the pre-reexamination claims would make clear that the reexamination (impermissibly) broadened the claims by removing structural limitations.

The parties agree that pre-reexamination claims 1, 7, and 21 would not be subject to § 112(6) if they had recited structure. They did not, however. This is made readily apparent by comparing the original claim language to reexamined claims 1, 48, 54, 55, and 58, which added structural components that did not appear in the original claims. LS Cable's argument against the application of § 112(6) rests *entirely* on its (incorrect) assertion that these pre-reexamination claims recite "first and second voltage detectors and a microprocessor." (*Id.*). LS Cable is simply mistaken: The pre-examination claims do ***not*** recite this language. (ECF No. 72-1 at 15-16). Critically, LS Cable does not allege that the actual claim language—"overvoltage monitoring unit"—alone connotes sufficient structure to avoid § 112(6).

As Apple explains below, the phrase lacks sufficiently definite structure and must be construed under § 112(6).

### 1.    Means-Plus-Function Under 35 U.S.C. § 112(6) Applies

LS Cable's plain-meaning argument fails because the claims do not convey structure to the person of ordinary skill in the art ("POSA"). As Dr. Phinney explains in his declaration,

"overvoltage monitoring unit" is not a term of art and has no established plain and ordinary meaning.  (*See* Phinney Decl. ¶ 36.)  LS Cable provides no contrary expert testimony.

LS Cable's plain-meaning approach also fails because the claims do not recite sufficiently definite structure and are purely functional.  *See Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1348–49 (Fed. Cir. 2015) ("§ 112, para. 6 will apply if the challenger demonstrates that the claim term fails to 'recite[ ] sufficiently definite structure' or else recites 'function without reciting sufficient structure for performing that function.'" (cleaned up)).  Here, they define "overvoltage monitoring unit" only by what it does: monitor voltages at both ends of the constant voltage/constant current supplier and transmit a monitoring result by wireless communication.

Contrary to LS Cable, the claims do not identify any circuitry or structure within the "unit" that performs these functions.  (*See* LSC Op. at 16; *see also* ECF No. 72-1 at 14-16.) Indeed, the words "detectors" and "microprocessor" do not appear within those claims at all.  The claims' use of the generic term "unit" thus overcomes the presumption that § 112(6) is inapplicable.  *See Diebold Nixdorf, Inc. v. Int'l Trade Comm'n*, 899 F.3d 1291, 1297 (Fed. Cir. 2018) ("cheque standby unit" subject to § 112(6)).

Comparison to other claims confirm the point.  For example, reexamined claims 1, 48, 54, 55, and 58 expressly add structure, such as a "microprocessor."  Pre-reexamination claims 3 and 9 likewise recite a "wireless transmitting unit," "first" and "second" "voltage detectors," a "voltage comparator," and a "microprocessor."  If "overvoltage monitoring unit" itself connoted sufficient structure, those additions would be redundant.

Contrary to LS Cable's reading, the reexamination history also confirms Apple's position. In evaluating the pre-reexamination claims at issue, the Examiner stated that while "overvoltage monitoring unit" "does not use means, . . . it provides no structure therefore it can be deemed a generic placeholder that substitutes for means [and] is modified by functional language."  (Ex. 1 at 14.)  So, "112(f) is invoked." (*See id* at 15.)  The Examiner therefore ***agreed*** with Apple that the phrase at issue is means-plus-function.

In response, the applicant did not dispute the Examiner's means-plus-function determination.  Instead, the applicant amended the claims to add structural components—namely,

a microprocessor—and argued that this took them outside of § 112(f). (*See* Ex. 2 at 27–28.) Deeming this ***still*** to be an insufficient recitation of structure, the Examiner rejected the claims again. (*See* Ex. 3 at 8.) In response, the patentee completely removed the phrase "overvoltage monitoring unit" from claims 7 and 21 but kept it in claim 1, which expressly recites additional structural components: two voltage detectors and a microprocessor. (*See* Ex. 4 at 2–8.) The Examiner confirmed that those components supplied sufficient structure to avoid § 112(f). (*See* Ex. 5 at 4–5.) Importantly, and contrary to LS Cable's assertions, the pre-reexamination claims at issue here did not recite any such components. A POSA thus would not have understood "overvoltage monitoring unit" to connote sufficiently definite structure, and Section 112(6) applies. (*See* Phinney Decl. ¶¶ 35–38.)

### 2.     Function and Corresponding Structures

LS Cable's contention that Apple's proposed function "does not appear in the claim language" is wrong. (*See* LSC Op. at 16.) The claims state that the unit performs two functions: (1) monitoring voltages at both ends of the constant voltage/constant current supplier; and (2) transmitting a monitoring result to the external contact-less charging device by means of wireless communication. The phrase "overvoltage monitoring unit" itself further specifies that the unit monitors for *over*-voltages. Apple's proposed functions thus mirror the claim language. (Phinney Decl. ¶ 35.)

For the first function (monitoring), the specification identifies the corresponding structure as two voltage detectors and a microprocessor. (*See id*. at ¶¶ 42–46.) The patent explains that the overvoltage monitoring unit preferably includes "first and second voltage detectors for respectively detecting voltages at the front and rear ends of the constant voltage/constant current supplier." (ECF No. 72-1 at 4:28–32.) It also explains that "[t]he microprocessor 310 . . . monitors whether an excessive voltage is applied to both ends of the constant voltage/constant current supplier." (*Id*. at 7:43–49; *see also* 8:32–41.) Figure 5, which the specification describes as "*the* embodiment of the present invention," provides further support for the two voltage detector and microprocessor structures:

[Fig. 5]

As Figure 5 depicts, the two voltage detectors (350 and 360) detect and monitor the voltages at the respective ends of the constant voltage/constant current supplier and provide the result to the microprocessor (310).  The microprocessor, in turn, processes the data to determine whether an overvoltage condition exists.  (ECF No. 72-1 at Fig. 5; Phinney Decl. ¶¶ 43–44.)

This identification of structure is consistent with the Examiner's understanding during reexamination.  The Examiner likewise identified voltage detectors and a microprocessor as the relevant corresponding structure.  (*See* Ex. 1 at 16.)  LS Cable provides no alternative structure.  Accordingly, the corresponding structure for the monitoring function is properly construed as two voltage detectors and a microprocessor.

For the second function (transmitting), the specification discloses three specific structures: a 10–15 MHz modulator, a photo coupler, and an antenna.  (*See* Phinney Decl. ¶¶ 47–50.)  It states that "a carrier of 10 to 15 MHz is used, and the wireless transmitting unit 320 is realized using a photo coupler...."  (ECF No. 72-1 at 7:56–63.)  It further explains that the wireless transmitting unit 320 "modulates the adjustment request signal and wirelessly transmits it to the antenna 220 of the wireless receiving unit 230 provided to the charging device C through the antenna 330."  (*Id.*; *see also id.* at 4:28–30, 6:28–30, 6:35–43.)  Although LS Cable argues that the "specification [should not be] limited" to these structures, it identifies no broader or alternative structures in the specification.  (LSC Op. at 16.)  Accordingly, the corresponding structure for the transmitting function is a 10–15 MHz modulator, a photo coupler, and an antenna.

**F.      Term 4 ("an overvoltage monitoring unit for …") (reexamined claim 56)**

| Claim Language | LS Cable's Construction | Apple's Construction |
|---|---|---|
| "an overvoltage monitoring unit detecting first and second voltages at both ends of the constant voltage/constant current supplier, monitoring the detected voltages at both ends of the constant voltage/constant current supplier and transmitting a monitoring result to the external contact-less charging device by means of wireless communication" | plain and ordinary meaning | Means-plus-function term under 35 U.S.C. § 112(6). Function:  Detecting and monitoring for overvoltages at both ends of the voltage/constant current supplier and transmitting a monitoring result to the external contact-less charging device by means of wireless communication  Structure for "detecting and monitoring …": two voltage detectors and a microprocessor  Structure for "transmitting…": a 10–15 MHz modulator, a photo coupler, and an antenna |

The phrase "overvoltage monitoring unit" in post-reexam claim 56 should be found means-plus-function for the same reasons.  Apple's proposed construction differs slightly from that for pre-reexamination claims 1, 7, and 21 to account for slight wording differences.

LS Cable points to an Office Action in which the Examiner listed several claims (including reexamined claim 56, then pre-reexamination claim 68) as not subject to § 112(f).  A review of the Office Action, however, reveals that the Examiner included claim 56 in that list accidentally.  Its inclusion is inconsistent with his prior and repeated finding that "overvoltage monitoring unit" without additional structure invokes § 112(f).  (*See, e.g.*, Ex. 1 at 15.)  Post–reexamination claim 56 does not differ in any relevant way from pre-reexamination claim 1, which the Examiner declared to be means–plus–function.  Post-reexamination claim 56 recites:

> . . . an overvoltage monitoring unit detecting first and second voltages at both ends of the constant voltage/constant current supplier, monitoring the detected voltages at both ends of the constant voltage/constant current supplier and transmitting a monitoring result to the external contact-less charging device by means of wireless communication so as to induce a change of intensity of the magnetic field. . .

(ECF No. 72-1 at 22.)  And pre-reexamination claim 1 recites:

> . . . an overvoltage monitoring unit for monitoring voltages at both ends of the constant voltage/constant current supplier and transmitting a monitoring result to the external contact-less charging device by means of wireless communication so as to induce a change of intensity of the magnetic field. . .

(*Id.* at 15.)

### G.    Term 5 ("an overvoltage monitoring unit") (claims 1, 48, 54, 55, and 58)

| Claim Language | LS Cable's Construction | Apple's Construction |
|---|---|---|
| "an overvoltage monitoring unit" | plain and ordinary meaning | "a unit for monitoring whether voltages exceed a predetermined reference value" |

The phrase "overvoltage monitoring unit" as used in post-reexamination claims 1, 48, 54, 55, and 58 differs from those discussed previously because they recite structure for that unit. Specifically, the claims recite that voltage detectors and/or a microprocessor within the unit perform the monitoring and transmitting functions. Accordingly, Apple does not contend that the "overvoltage monitoring unit" in these claims is a means-plus-function limitation.

Apple's construction clarifies what "overvoltage monitoring" means in the context of the patent by answering the question: over *what* voltage? While LS Cable offers no answer, Apple provides an answer that is firmly rooted in the specification.

The specification teaches that "overvoltage monitoring" means checking whether a voltage exceeds a predetermined reference value. (*See, e.g.*, ECF No. 72-1 at 12:18–23 ("[T]he microprocessor 240 of the charging device C checks whether the voltage state is in an overvoltage state. This checking process is realized in a way of *examining whether a difference of voltages at both ends of the constant voltage/constant current supplier 290 exceeds a predetermined reference value*." (emphasis added)); *see also id.* at 7:38–41 ("*[I]f a charging voltage exceeds a predetermined criterion*, the constant voltage/constant current supplier 290 charges the battery cell 300 in a constant voltage mode . . . ." (emphasis added)).) That is analogous to determining whether a car is speeding. Measuring speed alone is not enough. Instead, the measured speed must be compared to the speed limit. Likewise, an overvoltage monitoring unit must compare monitored voltages to a reference.

LS Cable's assertion that Apple's construction "divorces the term from the way it is used" and "improperly strips the term of its structural and functional context" is unfounded. LS Cable points to no inconsistency between Apple's construction and the surrounding claim language.

LS Cable's position that Apple's construction conflicts with claim 3 is equally meritless.

Claim 3 does not suggest that independent claim 1 encompasses overvoltage monitoring that excludes comparison to a reference. Instead, claim 3 states that the overvoltage monitoring unit includes a voltage comparator for comparing the detected voltages and outputting a voltage comparison result, which the microprocessor uses to produce the monitoring result that in turn induces a change of intensity of the magnetic field. The specification explains that the voltage comparison result may be a difference value or a state of voltages at both ends of the constant voltage/constant current supplier. "In the latter case, the voltage comparator 380 *compares a reference voltage difference* for an overvoltage state with a difference between the first and second voltages." (ECF No. 72-1 at 8:42–47 (emphasis added); *see also* 12:4–9; 12:18–23.) Rather than undermine Apple's construction, claim 3 reflects and reinforces the reference–value–comparison overvoltage determination that the specification describes.

### H.    Term 6 ("monitoring result") (claims 1, 7, 48, 54, 55, 56, and 58)

| Claim Language | LS Cable's Construction | Apple's Construction |
|---|---|---|
| "monitoring result" | plain and ordinary meaning | "result based on the monitored voltages from both ends of the constant voltage/constant current supplier" |

The parties' dispute here is whether "monitoring result" means the result of the monitoring step recited in the claims (as Apple contends) or any monitoring activity whatsoever (as LS Cable contends). In the context of the claims and specification, "monitoring result" clearly refers to the result of the recited monitoring at both ends step.

Apple's construction is grounded in the plain claim language. Each of claims 1, 7, 48, 54, 55, 56, and 58 recites a step of "monitoring" voltages at both ends of the constant voltage/constant current supplier followed by a step of transmitting a "monitoring result." The clear implication is that the "monitoring result" is the result of the "monitoring" activity that the claim just recited. LS Cable itself concedes that the plain meaning of "monitoring result" is "the output or information produced by a monitoring operation." (*See* LSC Op. at 17–18.) Here, that "monitoring operation" is the one explicitly recited in the claims.

Apple's construction also finds support in the specification. In every disclosed embodiment, the monitoring result is based on voltages monitored at both ends of the constant

voltage/constant current supplier. The specification identifies only four types of potential monitoring results: "[1] a charging power adjustment request signal, [2] a difference of voltages at both ends of the constant voltage/constant current supplier, [3] voltage values at both ends, or [4] a code indicating that the voltages at both ends are in an overvoltage state." (ECF No. 72-1 at 4:17–21 (emphasis added); *see also id.* at cls. 5, 6, 11, 12, 20, 22, and 24 (dependent claims reciting only those four potential monitoring results).) Each of the four potential results is based on the voltages at both ends of the constant voltage/constant current supplier. This is explicit in potential results [2]–[4]. It also is true for potential result [1]. The specification explains that, to prevent an overvoltage, the microprocessor "***monitors voltages measured at both ends*** of the constant voltage/constant current supplier" and, if an overvoltage state exists, "transmits a ***charging power adjustment request signal***." (*See id.* at 11:53–65 (emphasis added).)

Apple's construction does not exclude embodiments. To the extent that LS Cable's examples correlate with the "monitoring result," each is one of these four types of potential monitoring results. As LS Cable's own citations confirm:

(i)     a "voltage comparison result" is one of "a difference value of the first and second voltages" (potential monitoring result [2]);

(ii)    a "state of voltages at both ends . . . indicates whether an overvoltage is applied" (potential monitoring result [4]);

(iii)   a "voltage state signal indicat[es] a difference value of both measured voltages or . . . whether or not in an overvoltage state" (potential monitoring result [2] or [4]); and

(iv)    an "adjustment request signal of charging power" (potential monitoring result [1]).

(*See* LSC Op. at 18 (citing ECF No. 72-1 at 8:42–47, 8:64–67, 11:13–18, and 11:38–42).)

Finally, LS Cable's argument that Apple's construction of "monitoring result" is improperly limited to raw voltage values is wrong. Apple's construction requires only that the monitoring result be "based on" the monitored voltages.

## VI.     CONCLUSION

For the foregoing reasons, Apple respectfully urges the Court to adopt its constructions.

Dated:  April 28, 2026

MORRISON & FOERSTER LLP

By: /s/ Shaelyn K. Dawson
    Shaelyn K. Dawson

    Attorneys for Defendant
    APPLE INC.